IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MARK ENGEL, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | CIVIL ACTION NO. 20-00082-KD-N |
| ) | |
| LIBERTY INSURANCE CORPORATION, ) | |
| DONAN ENGINEERING COMPANY, ) | |
| INC.; COMPLETE DKI; ALACRITY ) | |
| SERVICES; LOWE'S; and WORLEY ) | |
| CLAIMS SERVICES, LLC[1] ) | |
| ) | |
| Defendants. ) | |

## Order

This matter is before the Court on the Motions for Summary Judgment filed by Defendants Liberty Insurance Corporation, Pro Construction, LLC d/b/a Complete DKI, and Alacrity Renovation Services, LLC (Docs. 136, 141, and 143); Plaintiff Mark Engel's Objection (Doc. 147); and Defendants' Replies (Docs. 148, 149, and 152).

**I.      Findings of Fact[2]**

On June 30, 2017, Plaintiff Mark Engel ("**Engel**") suffered damages at his home at Semmes, AL (the "**residence**"). (Doc. 137 at 3; Doc. 147 at 1). Specifically, Engel's home was flooded when a water pipe near the wet bar separated. (Doc. 137 at 3; Doc. 147 at 1). The water leaked for several hours, and a few inches of standing water culminated throughout the first floor

---

[1] Defendants Donan Engineering Company, Inc.; Lowe's; and Worley Claims Services, LLC, have been dismissed (Docs. 63, 53, 49).

[2] The facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998–999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

of the residence. (Doc. 136-1 at 7). Shortly thereafter, Engel reported the damage to his insurer, Defendant Liberty Insurance Corporation ("**Liberty**"). (Doc. 136-1 at 8).

Liberty immediately contacted Defendant Pro Construction, LLC d/b/a Complete DKI ("**DKI**")[3], a nearby water remediation company, and hired them to remove the water and moisture that built up throughout the residence. (Doc. 136-1 at 8; Doc. 142 at 7). DKI went to Engel's home the same day the leak was reported and promptly began drying out the residence. (Doc. 136-1 at 9; Doc. 137 at 3). Engel did not request DKI to perform any specific drying out procedures, including a flood cut. (Doc. 136-1 at 13). A flood cut is the removal of drywall up to a certain height above the water line to help with drying.

DKI started the remediation by removing the standing water with vacuums over the course of 3-4 hours; this was done in the presence of Engel and to his satisfaction. (Doc. 136-1 at 16-18; Doc. 137 at 3). Next, DKI placed three dehumidifiers and nineteen "air movers" in and around the residence and left them there for several days to remove built up moisture. (Doc. 136-1 at 20; Doc. 136-12 at 1).

A few days later on July 5, 2017, while DKI was drying out the home, Liberty sent a field adjuster, Mark McMillen, to Engel's residence to assess the scope of damages and authorize needed repairs to the home. (Doc. 143 at 8). Plaintiff's brother, Daniel Engel ("**Daniel**"), an unlicensed contractor who built the residence, was hired by Engel to complete the necessary repairs and was present at the home inspection. (Doc. 143 at 8; Doc. 140-2 at 3, 6). Thus, McMillen, Daniel, and Engel discussed the needed repairs to the home. (Doc. 140-2 at 7; Doc. 143 at 8). While analyzing the damage, Daniel, who has minimal experience in removing water

---

[3] Liberty was connected with DKI through the assistance of Defendant Alacrity Renovation Services, LLC ("**Alacrity**"). Alacrity connects water mediation contractors to Liberty's insureds. (Doc. 142 at 2).

from homes[4], verbally suggested to McMillen that a flood cut should be performed. Daniel made the suggestion without the benefit of any moisture readings or reviewing DKI's drying logs. (Doc. 136-2 at 9-10; Doc. 140-1 at 18; Doc. 140-2 at 8, 16-17; Doc. 143 at 9).

On July 7, 2017, DKI concluded their services by taking moisture readings throughout the residence to ensure moisture levels had returned to normal.[5] (Doc. 136-12 at 2). The final moisture readings confirmed that the moisture levels in the residence were below average. (Doc. 136-12 at 2). A few weeks later on July 24, 2017, after Daniel had suggested to Engel that a flood cut might be beneficial, Engel and his wife signed a certificate of satisfaction acknowledging they were satisfied DKI removed the water and moisture from the residence. (Doc. 136-1 at 23; Doc. 136-3; Doc. 140-1 at 9).

On August 16, 2017, Daniel submitted his first estimate for repairs to Liberty. (Doc. 140-3 at 8). Neither Liberty nor Engel instructed Daniel on what to include in his proposal. (Doc. 140-1 at 22; Doc. 140-3 at 3). The first proposal did not include a request for a flood cut. (Doc. 140-3 at 3, 65-86). Daniel submitted a second estimate on or about September 19, 2017. (Doc. 140-3 at 4). The second proposal did not include a request for a flood cut. (Doc. 140-3 at 4, 95-116). Daniel states that a flood cut was not requested because Liberty said they would not pay for a flood cut. An alternative repair was included instead of the flood cut.

Liberty then authorized and paid for $58,009.42 in repairs to be performed by Daniel on behalf of Engel, which was over $30,000 more than Liberty's initial estimate. (Doc 140-2 at 22;

---

[4] Daniel's only experience in removing water was from his personal home. He took a seminar prior to 2008 and admits that water remediation tactics have changed since then. He has never conducted water remediation in a professional or commercial context. (Doc. 136-2 at 10).
[5] DKI's drying standard goal was a level of 12. At first, these rooms ranged between 66-87, meaning there was significant moisture. When DKI completed their services, these rooms ranged from 3-11, and thus successfully dried out per DKI standards. Moisture readings were taken in the laundry room, living room, kitchen, master bedroom, office, and hallway. (Doc. 136-12 at 2).

Doc. 140-3 at 3-4). Daniel completed at least some of the repairs and Engel moved back into the residence on or about November 8, 2017. (Doc. 140-2 at 19-20; Doc. 140-1 at 25). Shortly thereafter, Engel began to notice a large number of screw pops[6] around the residence and requested Liberty to come inspect it. (Doc. 140-1 at 25). Engel believes moisture from the flood and the failure to properly dry out the walls with a flood cut is the cause of the screw pops. Prior to the flood, Engel had only seen one screw pop in the residence. (Doc. 136-1 at 28).

On December 5, 2017, Liberty sent a professional engineer, Jonathon Woodard, to inspect the residence. (Doc. 140-3 at 166). Woodard issued a report dated December 22, 2017, and determined that "no evidence was found of ongoing elevated moisture in the [residence]." (Doc. 140-3 at 171). He also concluded that the cause of the screw pops "are the result of environmental acclimation of the wood framing following the reported water leak and subsequent drying process, followed by repairs prior to completion of the re-acclimation process, which can be considered a *construction error*." (Doc. 140-3 at 171-172) (emphasis added).

Engel then filed a complaint with the Alabama Department of Insurance on January 12, 2018. (Doc. 140-1 at 37). Engel claimed Liberty mishandled his claim. (Doc. 140-1 at 37). The Alabama Department of Insurance disagreed, finding Liberty had acted appropriately. (Doc. 140-1 at 45). Engel's claim was dismissed by the Alabama Department of Insurance on January 29, 2018. (Doc. 140-1 at 45).

Nine months later in September of 2018, Engel hired a professional engineer, Russell Barton, to inspect the residence for the cause of the screw pops. (Doc. 140-6 at 11). Barton's report, dated January 7, 2019, stated that "the house should have had a 'flood cut'" and acknowledged that "one of the causes of 'screw popping' is moisture." (Doc. 140-6 at 16).

---

[6] Screw pops are small circles that protrude from drywall.

However, Barton did not take any moisture readings when he inspected the residence. (Doc. 140-6 at 4). Nor did Barton review DKI's drying logs or any moisture readings that were previously taken. (Doc. 140-6 at 12). Barton also conceded that the most accurate moisture readings would have been taken at the time of the loss, which showed there were no elevated levels of moisture in the residence. (Doc. 140-6 at 4; Doc. 136-12 at 2). Last, Mr. Barton agreed that he was not a water remediation expert and that "[his expertise] is structural design, structural framing, [and] structural damage." (Doc. 140-6 at 14).

Both Liberty and DKI had separate water remediation experts inspect the residence in early 2021. (Doc. 136-49; Doc. 140-4). DKI's expert, Craig Humphrey, found that "moisture readings reached and exceeded moisture goals that were set." (Doc. 136-9 at 8). Mr. Humphrey's report concluded that the cause of screw pops were contractor (Daniel) error.[7] (Doc. 136-9 at 9). His report then concluded that "a correlation between the claimed water loss event, subsequent drying efforts, and protrusion of nails through the gypsum wallboard [was not] established." (Doc. 136-9 at 10). Liberty's expert, James Wilbourn, found that their moisture readings of the residence revealed normal moisture contents. (Doc. 140-4 at 6). His report also concluded that the screw pops were a result of contractor error[8] and that there was no need to perform a flood

---

[7] "Causes of nail pops: improper spacing of drywall screws or nails; installing the fasteners at an angle, rather than driving straight into the stud; missing the stud altogether with the drywall fastener; nails that are too short, resulting in insufficient penetration of the stud; overdriving the drywall screws or nails, breaking into the soft gypsum layer of the sheetrock; using too many, or too few, drywall connectors; foundation settling." (Doc. 136-9 at 9).

[8] "The reported nail/screw pops, waves, and detached tape joints in the interior gypsum board wall and ceiling surfaces were preexisting and had been neither caused nor affected by the subject water loss or the water mitigation activities performed by DKI. The nail/screw pops had been caused by retraction of the nail shank due to long-term shrinkage and thermal movements in the wood framing since the original construction of the residence. The drying-related shrinkage of the wood framing in the subject residence was greater-than-normal because the moisture content in the wood framing was higher-than-normal when the gypsum board was installed due to prolonged exposure to moisture during construction. The waves and detached

cut as part of the water remediation process. (Doc. 140-4 at 5). Mr. Wilbourn opined that there was no correlation between the water damage from the flood and screw pops. (Doc. 1404 at 5).

Plaintiff Mark Engel initiated this case by filing a state court complaint in the Circuit Court of Mobile County, Alabama, on December 21, 2019. (Doc. 1-2). On February 12, 2020, the case was removed to this Court under 28 U.S.C. § 1441(a) and 28 U.S.C. § 1332. (Doc. 1). Engel alleges claims against DKI and Alacrity[9] for negligence arising out of allegedly improper water mitigation and authorized repair work performed on the residence (Count I)[10]. Engel also alleges claims against Liberty for 1) breach of contract related to the repairs performed (Count II); and 2) bad faith in how the repairs were handled (Count III).

## II.   Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Rule 56(c) provides as follows:

> *(c) Procedures*
> *(1) Supporting Factual Positions.* A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

---

tape joints in the interior gypsum board wall and ceiling surfaces were the results of substandard installation methods employed during the original installation of the gypsum board and during the reported re-skimming of the gypsum board that was reportedly performed to repair the nail/screw pops."

[9] Alacrity filed a crossclaim against DKI claiming breach of contract (Count I), contractual indemnity (Count II), and common law indemnity (Count III) (Doc. 88).

[10] The Court granted Liberty's motion to dismiss the negligence claim (Count I) (Doc. 104).

**(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

***(2) Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

***(3) Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

***(4) Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).

The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323.  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992).

### III.  Motions to Strike

Liberty moves to strike Brian McGlaughin's affidavit and argues that Engel never disclosed McGlaughin as a potential witness. (Doc. 151). McGlaughin is Engel's neighbor. He

states that he was in Engel's home "at least a dozen times" before the flood and "there were no problems with the interior walls, no nail pops were noticed, …" (Doc. 147-16). Engel was ordered to respond to the motion to strike but failed to do so. Having no explanation for why Engel failed to timely disclose McGlaughin as required by the discovery schedule, Liberty's motion is **GRANTED**.

Liberty also moves to strike portions of Daniel Engel's affidavit. (Doc.150). Liberty argues that Daniel was not disclosed or qualified as an expert witness on water remediation and the Court should strike the portions "regarding his opinion on (1) whether a flood cut was necessary; and (2) the cause of the screw/nail pops in Plaintiff's home and disregard such testimony[.]" (Id. at 4). Again, Engel has failed to respond as ordered. There is no information in the record that Daniel Engel is qualified to give an opinion that a flood cut was necessary for remediation or to give an opinion as to the cause of the screw pops. The Court is able to glean from the record that Daniel has had employment as an adjustor and has built houses for a number of years, yet these bare facts alone do not provide a basis for his opinions. Engel has failed to even attempt to explain why Daniel should be accepted as an expert on these topics. Accordingly, Liberty's motion is **GRANTED.**

IV.   Analyses

   A.  **Negligence**

Engel alleges in the Complaint that DKI and Alacrity were negligent in their performance of the water mitigation work at the residence. A plaintiff must satisfy four elements in a claim for negligence: "(1) that the defendant owed the plaintiff a duty; (2) that the defendant breached that duty; (3) that the plaintiff suffered a loss or injury; and (4) that the defendant's breach was the actual and proximate cause of the plaintiff's loss or injury." Woods v. United States Steel Corp.,

No. 2:17-CV-00883-RDP, 2018 WL 6067502 at *4 (N.D. Ala. 2018) (citing DiBiasi v. Joe Wheeler Elec. Membership Corp., 988 So. 2d 454, 460 (Ala. 2008); see also Franks v. Bolden, 774 F.2d 1552, 1555 (11th Cir. 1985) (same).

DKI and Alacrity deny they performed negligently and they deny they owed any legal duty to Engel, as it was Liberty that hired and paid them for their services. Engel failed to respond to either argument. Specifically, Engel has failed to show that DKI or Alacrity owed him a duty.[11]

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 317–18, 106 S. Ct. 2548, 2550, 91 L. Ed. 2d 265 (1986); see also United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Ctys. in State of Ala., 941 F.2d 1428, 1438 (11th Cir. 1991) ("If the nonmoving party fails to 'make a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' Celotex, 477 U.S. at 323, 106 S.Ct. at 2552, the moving party is entitled to summary judgment."); see also S.D. Ala. Civ. L.R. 56(b) ("The non-movant's brief must include: (1) all

---

[11] Engel should not mistake this determination as a finding that a duty was not owed by DKI or Alacrity. Rather, Engel has failed to meet his burden to even address whether a duty was owed.

facts relied upon, each supported by a specific, pinpoint citation to the record; (2) all challenges to the movant's asserted facts; and (3) argument supported by legal authority as appropriate.") (emphasis added). Accordingly, Engel's negligence claim against DKI and Alacrity fails as a matter of law.

### B.  Breach of Contract

Engel alleges in the Complaint that Liberty breached the insurance contract by failing to properly oversee the repairs, in particular that they did not authorize a necessary flood cut. (Doc. 1-2 at 19). Liberty argues in their Summary Judgment Motion that the insurance policy does not require it to supervise the repairs or ensure the work is done properly, and that they performed their obligations under the contract by *paying* to repair the property. (Doc. 1-2 at 17; Doc. 140-3 at 38-39); (Doc. 143 at 16-20) (citing Norman v. Liberty Mut. Fire Ins. Co., 471 F. Supp. 3d 1225, 1233 (N.D. Ala. 2020) ("The insurance policy did not require Liberty Mutual to repair or replace Plaintiffs' home, or to assure that its payment resulted in an adequate repair or replacement. Rather, it obligated Liberty Mutual to pay to repair or replace the home.") and Mitchell v. State Farm Fire & Cas. Co., 642 So. 2d 462, 465 (Ala. 1994) (holding that the insured, not the insurer, bears the primary responsibility to oversee a contractor's work.)).

Liberty also points out that while Daniel suggested that a flood cut should be performed, he never submitted any request for a flood cut or gave any estimates for a flood cut. Moreover, Liberty paid for the services requested in writing by Engel and his brother/contractor. As to damages, Liberty argues the alleged damages (screw pops, etc.) have not been shown to be related to the moisture from the flood, there is no evidence that there is moisture in the walls, nor is there evidence that the screw pops, etc., could have been prevented by a flood cut.

As to lack of moisture in the walls and the relatedness to the damages, Liberty relies on the expert testimony of Wilbourn who concluded that "the moisture readings taken during our inspection revealed normal moisture contents" throughout the residence and the screw pops "had been neither caused nor affected by the subject water loss or the water mitigation activities[.]" (Doc. 140-4 at 5-6) (Report of Findings dated March 29, 2021). Liberty also relies on the expert testimony of Woodard whose inspection report concluded that "no evidence was found of ongoing elevated moisture in the house" and the screw pops were caused by "construction error." (Doc. 140-3 at 171) (Donan Project Number: 18-17110235-0 dated December 22, 2017).

A plaintiff must prove four elements to recover on a breach of contract claim under Alabama law: "'(1) the existence of a valid contract binding the parties in the action, (2) [their] own performance under the contract, (3) the defendant's nonperformance, and (4) damages.'" Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 975 (Ala. 1998) (quoting *Southern Med. Health Sys., Inc. v. Vaughn*, 669 So.2d 98, 99 (Ala. 1995))." Cong. Life Ins. Co. v. Barstow, 799 So. 2d 931, 937 (Ala. 2001); see also Arrington v. Wells Fargo, 842 F. App'x 307, 312 (11th Cir. 2020).

Engel's Objection to Liberty's Motion for Summary Judgment fails to cite to any legal authority or discuss the elements of a breach of contract claim. (Doc. 147). Instead Engel provides a summation of "facts," some with evidentiary support and some without.

The gist of Engel's argument is that Liberty failed to perform under the contract because Liberty did not approve a flood cut as part of the repair process or require DKI to do a flood cut as part of the remediation. Engel further alleges that he was damaged by this decision because the residence continues to have residual damage due to the moisture from the flooding, e.g.,

11

screw pops. Engel argues that an issue of fact remains whether Liberty should have performed or approved a flood cut.

The Court agrees with Liberty that they had no duty to oversee the repairs by Daniel. And while Liberty controls reimbursement, Liberty did not control how Engel chose to repair his home. However, the Court will assume for purposes of this motion that Liberty controlled the remediation as performed by DKI. As such, the issue is whether Liberty should have paid DKI to flood cut the sheetrock in order to properly dry out the walls.

In support of his contention that a flood cut should have been approved, Engel relies on his brother/contractor who declared throughout the remediation and repair process that a flood cut was needed because the house had foam insulation. But as previously stated, Engel has made no effort to convince the Court that Daniel's opinion meets the threshold of reliability. Engel also alleges, without any evidentiary citation, that an engineer inspected the house and concluded that "the water was not properly removed from the house, that water still remained, and the house would continue to experience problems until the house was properly dried." (Doc. 147, p. 6). The Court assumes that the engineer referenced is Russell Barton and the report "that was provided to Liberty" is the report Liberty attached to its motion. (See Doc. 140-6). In that report Barton concludes:

> The house should have had a "flood cut" to remove the trim and sheetrock along the base of the house. With the sheetrock removed, the studs and insulation could have inspected for moisture and replaced if needed. We believe water entered the walls during the flood and moisture was trapped in the walls. One of the causes of "screw popping" is moisture. Due to the humidity, the stud framing is flexing and the drywall in those areas where the screws are popping can't, creating the popping. We recommend that some sections of the sheetrock and trim should be removed to allow for a thorough inspection of the walls and to measure the interior moisture content. If moisture is present, the damaged insulation should be replaced. The studs should also be tested for moisture, prolonged exposure to moisture will cause un-treated wood to rot. The existing drywall should be replaced. The drywall has had screws and joint tape/mud applied twice. The screws that have "popped" have also tore the paper of the sheetrock. The entire sheetrock will need to be replaced to provide a smooth wall finish.

Liberty responds that Barton is not qualified to opine that a flood cut was needed or that a flood cut could have prevented the alleged damages. Barton agreed that he is not qualified to opine on proper water remediation. (Doc. 140-6 at 49). His opinion that a flood cut should have been performed is based on his opinion that a cut would have allowed for inspection to determine *if* moisture was present. Barton does not opine that moisture was in fact present and he did not take any moisture readings. Instead, Barton simply states that screw pops can be caused by moisture and that "we" believe moisture was trapped in the wall after the flood. Barton provides no explanation or evidence for his belief.

In contrast, Liberty provides evidence and explanation for its contention that the moisture and resultant screw pops were not the fault of DKI's remediation performance after the flood. First, Liberty cites to an inspection of Engel's residence in December 2017, wherein Jonathon Woodard, P.E., inspected the property to determine the cause of the screw pops which were occurring on the first and second floor of the house. Woodard (of Donan Engineering) concluded that there was no evidence of elevated moisture in the house and that the screw pops were a result of Daniel not allowing a sufficient drying period prior to repairs. In early 2021, another

engineer, Wilbourn, inspected the property and concluded that the moisture readings were normal in the baseboard and other wood materials throughout the residence. Wilbourn also concluded that the screw pops and warping were caused by prolonged exposure to moisture when the home was originally built by Daniel. This opinion was based on the analysis of the home and photos of the original construction which showed water damage to the bottom of the studs prior to the completion of construction. His opinion was also based on the fact that the screw pops were occurring throughout the residence, including the second floor where no water leaked from the broken pipe.

Engel also claims there is a factual issue concerning whether moisture caused the screw pops. In support, Engel cites Liberty's response letter to the Alabama Department of Insurance wherein Liberty states that "[i]n an effort to determine the cause of the nail pops, Donan Engineering was hired to determine the reason. Moisture was the reason and we paid to repair the nail pops." (Doc. 147-15). The Court disagrees that there is an issue of fact as to whether moisture caused the screw pops. The cited experts agree that at some point moisture was present and caused the screw pops and warping. Liberty's experts diverge on the cause of the moisture causing the screw pops: Woodard appears to opine that it was Daniel's fault for not allowing sufficient drying time prior to repairs and Wilbourn contends it was caused by moisture from the original construction. But it is not Liberty's burden to show what caused the damage, it is Engel's burden to show, as he contends, that Liberty is responsible because the damages are the result of Liberty's failure to pay DKI to perform a flood cut.

At this juncture the Court must look to the evidence of record to determine whether there is sufficient evidence to support Engel's contention that Liberty should have, as part of their contractual obligation, required and paid  DKI to flood cut the sheetrock as a part of their

remediation efforts. There simply is insufficient evidence for a reasonable factfinder to find in favor of Engel. Instead, the unrebutted evidence is that DKI's drying process met industry standards and was not the cause of Engel's claimed damage. (Doc. 136-9) ("Based on our review of the file, a correlation between the claimed water loss event, subsequent drying efforts, and protrusions of nails through the gypsum wallboard cannot be established at this time. The documented drying logs for the water mitigation process to the residence followed all IICRC protocols in a timely manner. The nail pop ups observed during the observation do not coincide with the mitigation work that was completed nor the time frame of when they occurred.") Engel's unsupported speculation otherwise is insufficient to sustain his burden.

## V.     Bad Faith

Engel alleges, in the Complaint, that Liberty acted in bad faith in how the repairs were handled. (Doc. 1-2 at 20). In Alabama, it is well settled that "contractual liability is a prerequisite for liability for bad faith." Cong. Life Ins. Co. v. Barstow, 799 So. 2d 931, 937 (Ala. 2001). Thus, Engel's bad faith claim fails as a matter of law.

## IV.     Conclusion

Defendants' Motions for Summary Judgment are **GRANTED** as to all Counts (Counts I-III).  **Alacrity is ORDERED to notify the Court by February 16, 2022, whether its crossclaims against DKI are due to be dismissed as moot.**

A Final Judgment consistent with terms of this Order shall be entered by separate document as required by Rule 58(a) of the Federal Rules of Civil Procedure.

**DONE** and **ORDERED** this the 4th day of **February 2022.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**